UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PRIME RATE PREMIUM FINANCE
CORPORATION,

        Plaintiff,                                 Case Number 14-12397
                                                        Honorable David M. Lawson
v.

KAREN E. LARSON, Individually and as
Personal Representative of the Estate of
KEITH A. LARSON, Deceased,

        Defendants.
_____/

## OPINION AND ORDER DENYING DEFENDANT
## KAREN LARSON'S MOTION FOR RELIEF

Karen Larson, the sole remaining individual defendant in this fraud case, has been represented by a number of different lawyers in this litigation. All have withdrawn, and now she is representing herself. Her last attorneys, Martin Leaf and Samuel Gun, were allowed to withdraw after alleging in a motion that their relationship with their client had broken down. They made a point of stating that the disagreements did not focus on fee payments. At a hearing on April 24, 2017, the Court found that Leaf and Gun sustained their position and entered an order discharging them. Larson has moved for relief from that order.

### I. The Motion

Larson's motion papers are incoherent and do not set forth any legal argument, other than broadly alleging that Gun and Leaf violated their ethical duties. Her position can be summarized as follows: (1) Gun and Leaf lied to the Court in order to withdraw as her attorneys; (2) while they were retained, they did no work for her and even colluded with opposing counsel; and (3) Gun and Leaf's aggressive efforts to recover fees from Larson led to Keith Larson's health issues and

ultimately his death. Keith Larson, Karen's deceased husband, formerly was a defendant in this case. Larson asks the Court to recognize Ken Landini as an expert witness and order Gun and Leaf to pay Landini's outstanding fee of $57,958.75. She also asked the Court, before her husband's death, to order Gun and Leaf to set up a fund in the amount of $250,000 for the long-term care of Keith Larson.

## II. Supporting Allegations

Larson supplemented her 53-page motion with a number of ancillary papers and audio tapes, which have been reviewed. Martin and Leaf have responded, three times. Larson's factual assertions are shambolic, but the assertions can be sorted into four categories: 1) money and billing issues (which includes allegations regarding Keith Larson's health); 2) the report of Ken Landini, an expert retained on the defendant's behalf; 3) the "Tape"; and 4) the adequacy of Gun's and Leaf's representation.

### A. Money and Billing Issues

The main thrust of Larson's complaint is that on several occasions Gun and Leaf dishonored their fee arrangements and demanded exorbitant sums from Larson, even when they knew she was financially (and emotionally) unstable. She alleges that Gun's and Leaf's reason for withdrawing — that Larson gave them falsified evidence — was pretext for unresolved fee disputes, and that she paid them several thousands of dollars for work they either did not do in a timely fashion or never completed. Larson insists that Gun's and Leaf's aggressive efforts to recover payments placed tremendous stress on the Larsons and ultimately caused Keith Larson's death. Gun and Leaf vehemently deny Larson's allegations and assert that Larson repeatedly failed to make good on her payments, even after they let some payments slide.

The terms of Gun's and Leaf's fee arrangement with Larson changed several times over the course of their representation. In an email dated May 14, 2016, Gun noted that he and Leaf would be representing Larson in three cases and that Larson had paid them $15,200 up to that point. They all apparently agreed that Larson would pay Gun and Leaf $40,000 before they filed their initial appearances on June 1, 2016. Larson replied on May 16, 2016, accepting their engagement ("Absolutely I want you to represent me") and "totally Agree[ing] with the $40,000" as she knew they would "totally take care of [her]."

Sometime thereafter, issues arose regarding Larson's ability to make good on her payments. In an email dated December 11, 2016, Larson expressed that she understood their fee arrangement to be $10,000 per month, as was explained to her in August and October of that year. She attached a "retainer" agreement, which appears to be a memorialization of her understanding of their fee arrangement. On January 31, 2017, Gun emailed Larson regarding outstanding payments and complained that he and Leaf should be spending their time working on her case, not "chasing" after her for their fees. He noted that she was late on her payments for December and January, which, according to Gun, were due on the first and fifteenth day of each month. Gun followed up on February 5, 2017, explaining that as of that date, Larson owed them $21,000, and that they knew she was good for it. ("We both know you ALWAYS have at least $10-$20,000 on hand at all times . . . I know you have the money or can get it right away, I'm not waiting next 7 audits to complete . . . OK? We both know you have it.").

Larson saw things differently. In an email dated February 9, 2017 (an apparent response to Gun's emails), Larson asserted that she was working hard to make money to pay them, but their demands were unreasonable and unfounded. She noted that they initially had agreed on $25,000,

which was increased to $40,000 to cover their work on the third case. Larson believed that because the case against Joanna Dellin — one of Larson's former employees implicated in the case before the Insurance Commissioner — had been dropped, she expected a third of Gun's and Leaf's fee ($13,333) to be returned to her. Gun had informed Larson on at least one earlier occasion that she was billed for the work they performed, not on the number of cases. Larson also insisted that her monthly obligation be lowered to $7,500 per month, effective January 1, 2017. She stated she was willing to pay the maximum fee for two cases seen all the way through to trial, even though she had already paid Gun and Leaf $80,000. On February 11, Larson sent another email, this time insisting that she was current on her payments except for $3,000.

In her motion, Larson accuses Gun and Leaf of embezzlement based on their requests for cash payments and overcharging her credit card. Gun and Leaf assert that there was nothing inappropriate about their fee demands. They submitted an invoice for April 8, 2016 through January 31, 2017, which notes a total bill of $161,412.99 for all three cases and an outstanding balance of $126,412.99. More than half of that balance is for emails, billed at $300 per hour. Gun and Leaf represent that they only insisted that she pay them in cash because of her circumstances and that Larson made it a habit of giving them postdated checks. Gun and Leaf submitted to the Court a check for $1,300 dated June 25, 2016 that includes instructions to deposit the check on a later date. Another check for $3,600 includes the following handwritten note, presumably by Gun: "Went to Bank 2 times plus called twice, check was no good! No funds."

Larson denies that any of her checks to them bounced. Instead, she says that Leaf insisted on cash, while Gun accepted credit card payments. She cites at least one instance where she authorized a credit card payment on April 4, 2016 for $1,100, but Gun charged her for $1,400.

Ronald Kaplovitz, an attorney with a credit card processing system in his office sometimes used by Gun's and Leaf's clients, attested that his staff processed a debit/credit card payment from Karen Larson to Leaf and Gun on that date for $1,400. Despite her current concerns regarding that payment, in an email dated June 9, 2016, Larson acknowledged the charge for $1,400, but referred to it as "no big deal."

To make matters stranger, one of the recordings reveals that Larson attempted to pay Leaf with a "winning" lottery ticket. Sometime in January 2017, Leaf demanded $3,000 from Larson. She tried to give Leaf a lottery ticket worth $175, which she told him to "cash" at a gas station. Leaf apparently rejected her offering and informed Gun that Larson yet again failed to make good on her obligations. Larson later represented to Gun that she expected to make over $3,000 doing "safety programs" to cover her fees and could bring in as much as $30,000 per month.

As their relationship deteriorated, Larson decided to attribute her husband's health condition (and ultimately his death) to Gun's and Leaf's aggressive collection practices. Keith Larson was admitted to the hospital on December 22, 2016. That same day, Gun sent Larson a text message asking if they could meet and how much Larson would be paying. Larson responded that she would call him around six o'clock that evening to arrange their meeting. However, according to Larson, Gun's and Leaf's demands for payments somehow prevented her from performing CPR on Keith that day. She claims that she is a licensed physician's assistant and therapist and "specialized in heart and lung issues no matter what Sam Gun says." In an apparent attempt to further discredit Larson, Gun and Leaf performed a search of the department of Licensing and Regulatory Affairs and found no current licenses or registrations for Larson — only an expired registration for EMS paramedic "Karen Ann Larson."

Larson submitted an "affidavit" of her friend, John Roberts, who apparently received a frantic call that evening from Larson, saying that Gun would not let her get out of meeting him to settle her debts. Roberts said he saw Gun at the hospital later that evening and observed Larson handing Gun $1,500 in cash. Gun and Larson dispute how much money was exchanged that day.

### B. Ken Landini's Expert Report

During the hearing on Gun's and Leaf's motion to withdraw as Larson's attorney in April 2017, Gun and Leaf represented to the Court that they believed Larson prepared the expert report submitted by forensic accountant Kenneth Landini. Gun stated that he spoke to Landini, who told him that Larson could not afford to pay Landini, so he delegated the work to her. When Larson denied that accusation on the record, Gun said he was comfortable with the Court asking Landini to verify what happened. Gun and Leaf submitted meeting logs and timekeeping sheets, which include two identical entries for meetings with Landini in 2016. The entries dated July 25 and August 8 state "Office Conf with Ken Landini & Marty; review with Marty issues with expert report — appears client had significant hand in preparation." Gun and Leaf offer no other evidence to substantiate the statements they made to the Court.

Larson presents several letters from Landini that suggest Gun and Leaf lied to the Court. On February 21, 2017, Landini sent a letter to Larson informing her that he had prepared a preliminary report on January 9, 2017, but could not complete his report because he was awaiting additional information. In a letter dated June 5, 2017, Landini repeated those sentiments and noted, "Karen Larson did not write the report dated January 9, 2017." He stated that Craig Casagrande from his office assisted him in performing research and proofreading, and some of the report was an outgrowth of a summary overview he had prepared previously. Landini sent another letter to "whom

it may concern" on August 14, 2017, indicating that he could not complete his report without bank records from American Express. He explained that Gun and Leaf issued a defective subpoena to that company on November 16, 2016, which had to be reissued sometime thereafter. Landini noted that certain items contained in the report were verified by Larson, "[h]owever, this report was indeed written by me."

More recently, Larson submitted to the Court a sealed envelope from Landini's office. In yet another letter dated March 1, 2018, Landini explains that he was dependent on Larson's attorneys to obtain information, which resulted in a slow process of document production. On October 22, 2015, he prepared an overview report that outlined the progress of the investigation and made it available to Gun and Leaf. Landini says he was not made aware of the discovery deadline of December 5, 2016 and was only told that he should complete his report "around Christmas." Landini attached to his letter an email dated November 11, 2016, in which Gun's assistant indicated that the subpoena to American Express would be issued at the end of the following week so that the documents would be ready by December 2. However, that subpoena was incorrectly dated November 11, 2017 and was only reissued on December 7, 2016, after discovery closed. Because American Express informed Gun that they would not be able to produce the subpoenaed documents for at least sixty days, Landini prepared a preliminary report on January 9, 2017 without those records. Landini states that he delivered his preliminary report to Gun that same day.

In her motion, Larson insists that she did not receive a copy of Landini's report until two or three weeks after he delivered it to Gun. She says Landini needed Gun's and Leaf's approval before he could give it to her. Larson submitted an invoice from Landini dated December 15, 2016, which includes an outstanding balance of $57,958.75. She explains that her bill is so high because of

Gun's and Leaf's gross negligence, which caused significant delay in obtaining documents. She alleges that Gun and Leaf were on notice to issue those subpoenas in the summer of 2016, but did not do so until after discovery closed.

C. The "Tape"

During the Michigan Department of Insurance and Financial Services (DIFS) investigation of Larson's Insurance Solutions, Inc. (LISA), a DIFS investigator received an email from LISA employee Joanna Dellin that contained a recording of a February 28, 2014 meeting. In that meeting, Larson revealed to some LISA employees that the business was under investigation and admitted that she had falsified documents. Larson insists that Dellin created that tape using an application that manipulates samples of a person's voice to create entirely new statements and sentences that were never said.

In early October 2016, Larson contended that she discovered a tape containing evidence proving that she was not involved in falsifying documents at LISA. Larson provided a detailed account of her discovery of the tape. She alleges that she needed a tape and dictaphone to complete a safety program she was working on, but could not find a blank tape to use. Larson states that she scoured her storage closets, bedroom, desk, and boxes of legal documents before finally searching "John's" desk. In "John's" desk she discovered an unlabeled tape inside a tape recorder. Wanting to ensure that she did not overwrite anything important, Larson states that she decided to listen to the tape before using it for her safety program. Upon listening to the tape, Larson states that she immediately recognized the contents as a recording she covertly made of the February 28, 2014 meeting depicted on the tape provided by Joanna Dellin (JD tape). According to Larson the tape

reveals that, prior to admitting to falsifying documents, Larson stated that she would accept responsibility for falsifying the documents even though she was not involved.

Larson contends that she made a recording of the tape's contents on her phone on October 2, 2016 and transferred this recording to her computer on October 6. Several facts cast doubt on Larson's timeline. The metadata of the audio file on Larson's computer shows that the file was created on September 28, 2016, rather than October 6 as Larson claimed. In the extra portion of the audio file, recorded while Larson was driving and listening to the radio, news on the radio clearly identified the date as September 26, 2016, not October 2 as Larson claimed.

The tape's legitimacy is dubious. Larson stated that she had no memory of producing the tape until she discovered it. Further, the audio file generally has three levels of intelligibility, which suggests that parts of the audio were added later or dubbed over. At the beginning of the audio file, Larson can quite clearly be heard to say "It's 2/28/2014, going into a meeting." Immediately thereafter, audio quality decreases significantly, and Larson can be heard to say "I'm going to say this once and I'm going to say it one time only, I'm going to say I did this. Dad did nothing, knew nothing about it, I did it all." The rest of the tape is largely unintelligible. Although conversation can be heard throughout, it is difficult to make out more than a few words at a time. The few words that can be identified distinctly appear to comport with the transcript of the JD tape. On at least one occasion after the first thirty seconds, Larson's voice can be heard very clearly on the tape, despite the fact that Larson's other dialogue around the same time in the audio file is completely unintelligible. At 30:14, Larson clearly says "Maggie, tell 'em what you did." This, coupled with the fact that other conversation participants do not respond to Larson's statement here (as they

appear to do to all of her other statements) suggests this phrase may have been "dubbed in" after the underlying recording was made.

In an email dated October 20, 2016 Larson describes how the audio file was created. Larson planned to bring the tape immediately to Sam Gun, but Keith Larson had a health scare and was taken to the hospital. Karen Larson began playing the dictaphone tape and recording the audio on her phone, which she left at her home. Larson drove to the hospital and ate a meal, and when she returned home the dictaphone had stopped and her phone was "locked." Unbeknownst to Larson, her phone was still recording. Larson discovered at some point that her phone had been recording her for at least two hours while driving, visiting the hospital again, and playing with her dog. The final recording is three hours and ten minutes long.

### D. Adequacy of Gun's and Leaf's Representation

Larson alleges that neither Gun nor Leaf did anything for her case while they were retained and instead were focused on getting paid. She cites a handful of instances where Gun or Leaf (or both) dropped the ball in her case, but nevertheless relentlessly insisted that she make good on her monthly payments. Larson alleges that she paid Gun $5,200 in April 2016 to "research whether the Larsons had insurance defense funds from E&O carriers," but he did not look into those matters until December of that year. Moreover, as noted above, Landini was unable to complete his expert report timely because the subpoenas for bank records were issued after the close of discovery. Larson says that Gun and Leaf had ample time to prepare those subpoenas, and because of their negligence, she cannot call Landini as an expert or use his preliminary report at trial.

With regard to Joanna Dellin's bankruptcy proceeding, Gun and Leaf insist that they were prepared for trial, but nevertheless advised Larson that settling was in her best interest because they

had no expert witness (among other reasons). Larson believes Gun and Leaf were grossly underprepared for that proceeding and pressured her to drop the case two days before trial. Further, Larson believes Gun and Leaf became more involved in her case after they had expressed their desire to resign. She says that between April 4, 2016 and February 6, 2017 (the date she believes marked the end of their working relationship), she received 201 emails from Gun and Leaf. In the three months that followed, she received 107 emails related to billing. She insists that even after she paid, they would demand more money to satisfy their $10,000-per-month agreement. Gun and Leaf attempt to refute her allegations with a statement of services rendered, which shows extensive work performed by them.

In her motion, Larson indicates that their relationship fell apart on November 17, 2016, when it became clear to her that Gun and Leaf were working against her with attorneys Mark Bucchi and Debra Pevos. However, several communications between Larson and Gun suggest otherwise. In the recordings submitted to the Court, Larson and Gun can be heard saying "I love you," "sweetheart," and "honey" to each other, well after November 17. Those terms of endearment are interspersed in their email and text communications as well. Moreover, in a recording from January 28, 2017, Larson and Gun spoke at length about case strategy. Gun even sounds aligned with Larson against Leaf, noting that Leaf is an "idiot" (among other choice words) and suggesting that Larson record her calls with Leaf. Gun had already given her permission to record their calls. In an email dated February 5, 2017, Gun told Larson that she finally established that she has a "very viable and provable defense," concluding with "You are an amazing woman. You did get totally ripped off and we can prove it."

III. Responses

Gun and Leaf initially filed a response on June 30, 2017 in which they deny as untrue Larson's above claims. In the attached brief, Gun and Leaf dispute the legitimacy of Larson's filing and state that they are unable to file a proper brief in response. Apparently they found their way to overcome their perceived obstacles, as they now have filed two supplemental responses.

A. First Supplemental Response

On February 8, 2018, Gun and Leaf filed a supplemental response directly rebutting the claims outlined in Larson's motion. On billing and performance, Gun and Leaf argue that, contrary to Larson's claim that they did virtually nothing, they performed substantial services and have attached detailed billing information to support this claim. Gun and Leaf also dispute that they were paid over $80,000. Gun and Leaf provide an invoice suggesting that they were paid $69,800 in total. Gun and Leaf dispute Larson's claim that they were unprepared for a bankruptcy hearing involving Joanna Dellin, and attach time logs and the case's docket to demonstrate the work they performed on that case. Gun and Leaf also dispute Larson's allegation that they had agreed to be paid "per case" rather than on an hourly basis. Gun disputes Larson's contention that she was deliberately overcharged on April 26, 2016 when making a credit card payment to Gun at the office of Ron Kaplovitz.

Gun and Leaf deny that they were responsible for Keith Larson's ill health and death. Gun disputes Larson's allegation that he demanded she pay him and leave Keith Larson by himself on the day he suffered brain death and was permanently committed to the hospital. Gun and Leaf also dispute Larson's claim that she is a physician's assistant and registered therapist. Leaf disputes that he ever "demanded" payment from Larson, and only requested payments in cash as he knew Larson

had outstanding debts to her past attorneys, had provided Gun and Leaf with check and credit card payments in the past that were not honored, and was captured in the February 28, 2014 recording attempting to stop payments made on checks she had issued.

Gun and Leaf argue that the "Landini Report" "most likely does not exist nor has it ever existed." They also argue that there is no evidence that Ken Landini is a forensic accountant or has testified as an expert witness in other cases. Gun alleges that Landini denied ever producing a report concluding that any of Larson's employees (other than Karen and Keith Larson) "were responsible for the financial troubles of the Larson Insurance Agency." Gun further alleges that, at meetings in July and August of 2016, Landini admitted that he did not write the report that Larson insists he wrote as early as 2014.

Gun and Leaf deny colluding with Mark Bucchi, stating that they shared discovery with him as required by Court Rules.

## B. Second Supplemental Response

Gun's and Leaf's second supplemental response filed on February 12, 2018 primarily addresses the legitimacy of a cassette tape Larson allegedly discovered in September 2016. According to Gun and Leaf, Larson alleges that she discovered a previously-forgotten tape, which would provide evidence that she did not falsify finance agreements. Gun and Leaf allege that the tape is not genuine. They contend that Larson wrote a very detailed email about how she discovered the tape, recorded it onto her phone, and copied it to her computer on October 2, 2016, but several pieces of evidence contradict her assertion. First, Larson's phone recording of the tape included several hours of her driving and listening to the radio, unaware that her phone was continuing to record. Due to a radio broadcast captured on the tape, the date can clearly be identified as

September 26, 2016 (a week before Larson claims to have discovered the tape). Second, metadata from the audio file state that the file on Larson's computer was created on September 28, 2016. Third, the exculpatory portions of the "newly discovered" tape appear to have been dubbed over, as participants in the conversation do not react to them and they are much more intelligible than the rest of the recorded conversation. Fourth, Larson previously alleged that the original recording of the February 28, 2014 meeting was completely fabricated, and that she never spoke the words she appears to say on the tape. After "discovering" this new tape, however, Larson testified that the original recording does reflect what she said, but that key parts of that tape were omitted. Gun and Leaf argue that the tape constitutes false material evidence, compelling them to reveal attorney-client privileged information to correct the falsehood. The remainder of Gun and Leaf's Second Supplemental Response echoes the arguments set forth in their First Supplemental Response [dkt. #126].

C. Larson's Reply

On March 5, 2018, Larson attempted to file several papers and compact disks with the Clerk's office, which can be generously construed as a reply brief to Gun's and Leaf's response papers. "Attachment A" appears to be the first page of her reply, in which she lists six "motions." Motion #1 asks the Court to fine Gun and Leaf for the cost of uncovered medical care (or the "cost of the life of Keith Alan Larson") in the amount of $321,682.94, which she says does not include various co-payments. Motion #2 asks the Court to support an independent investigation of the Insurance Commission through the appointment of an outside investigator. She believes such an investigation will result in criminal charges against a number of employees involved in the alleged "framing" of the Larsons. Motion #3 requests that "any awards by the Judge be outside of any

current or future bankruptcy for Karen Larson, Keith Larson, Sam Gun, and Martin Leaf." She represents that Judge Drain honored that request in a similar fraud case pending before him. Motion #4 asks the Court to support an administrative review of Sam Gun by "the judicial committee" on whether Gun and Leaf may keep their licenses. Larson says Gun intends to retire "if he loses the review." Motion #5 asks the Court to further fine Gun for lying to the Court when he stated that he had not received "any prior judicial actions related to practicing law in his entire career." And Motion #6 requests that the Court enter a restraining order against Gun, Leaf, Joshua Larson, and Karen Kuula Larson. Larson asks that those individuals be prohibited from coming any closer than 1,000 feet from her or her residence. She represents that her property has been vandalized on several occasions, but she does not say by whom.

## IV. Discussion

The volume of paper and recorded media submitted by defendant Larson and her former attorneys confirm at least two things: Larson, Leaf and Gun do not get along with each other, and each casts doubt on the other's credibility. Larson presents her motion as a Bill of Grievances, and she asks for a variety of forms of relief. And although Larson's several demands seek recourse for the perceived abuse she believes she suffered at the hands of her former lawyers, none of those remedies are properly brought before this Court. Larson cites no legal authority to support her demands, but at best her claims would arise under state law, and there is no suggestion that the parties' citizenship is diverse.

It has been acknowledged that federal courts have supplemental jurisdiction to resolve fee disagreements between lawyers and clients that arise from the main action. *E.g., TC Power Ltd. v. Guardian Indus. Corp.*, 969 F. Supp. 2d 839, 840 (E.D. Mich. 2013) (citing *Kalyawongsa v. Moffett*,

105 F.3d 283 (6th Cir.1997)). But Larson's grievances against Gun and Leaf extend far beyond a mere fee dispute; they take on the character of malpractice and fraud, and impact more cases than the one before the Court. Supplemental jurisdiction will not stretch that far. If Larson wants recompense from Leaf or Gun, she must bring her claims in a court that would have jurisdiction over them.

Larson also may be seeking relief from the order permitting Leaf and Gun to withdraw.

Federal Rule of Civil Procedure 60(b) allows the Court to relieve a party from a final judgment or order for several reasons, including "(1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence . . .; (3) fraud . . ., misrepresentation, or misconduct by an opposing party; (4) the judgment is void; [and] (5) the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b). Rule 60(b)(6) also permits the court to grant a motion for relief from judgment for "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6). Larson has not identified any particular ground, but based on her many contentions, a good surmise would point to subparagraphs (3) and (6).

Rule 60(b)(3) allows the court to grant relief based on the opposing party's "fraud . . ., misrepresentation, or misconduct." Relief is appropriate where the moving party "'show[s] that the adverse party committed a deliberate act that adversely impacted the fairness of the relevant legal proceeding [in] question.'" *Info-Hold, Inc. v. Sound Merchandising, Inc.*, 538 F.3d 448, 455 (6th Cir. 2008) (quoting *Jordan v. Paccar, Inc.*, 97 F.3d 1452, 1996 WL 528950, at *6 (6th Cir. 1996) (table)). "Fraud is the knowing misrepresentation of a material fact, or concealment of the same when there is a duty to disclose, done to induce another to act to his or her detriment." *Id.* at 456.

"Fraud thus includes 'deliberate omissions when a response is required by law or when the non-moving party has volunteered information that would be misleading without the omitted material.'" *Ibid.* (quoting *Jordan*, 1996 WL 528950, at *6; citing *O'Neal v. Burger Chef Sys., Inc.*, 860 F.2d 1341, 1347 (6th Cir.1988)).

Larson has made allegations which, if true, could support a theory that Gun and Leaf made false statements to support their request to withdraw as Larson's attorneys. And lying to the Court is a serious matter. But in the end, relief under Rule 60(b) would come in the form of vacating the order discharging Gun and Leaf, which would put them back as Larson's lawyers. Based on the obvious acrimony and distrust that now pervades their relationship, that would do no good to anyone connected to this case. And certainly that pyrrhic remedy would not "impact[] the fairness of the relevant legal proceeding [in] question" for the better. Rather than undoing the discharge order, Larson would be better served seeking relief in a separate civil lawsuit in an appropriate court or from an attorney discipline forum.

The Sixth Circuit has held that a court may grant relief under Rule 60(b)(6) "'only in exceptional and extraordinary circumstances,' which are defined as those 'unusual and extreme situations where principles of equity mandate relief.'" *Export-Import Bank of U.S. v. Advanced Polymer Sciences, Inc.*, 604 F.3d 242, 247 (6th Cir. 2010) (quoting *Jinks v. AlliedSignal, Inc.*, 250 F.3d 381, 387 (6th Cir. 2001)). In addition, "something more than one of the grounds in subsections (1) through (5)" must be shown to justify relief under Rule 60(b)(6). *East Brooks Books, Inc. v. City of Memphis*, 633 F.3d 459, 465 (6th Cir. 2011) (quotation marks omitted). This provision "confers upon the district court a broad equitable power to 'do justice.'" *Johnson v. Bell*, 605 F.3d 333, 336 (6th Cir. 2010). It "empowers district courts to revise judgments when necessary to ensure their

integrity." *Ibid.* "[A] motion made under Rule 60(b)(6) is addressed to the trial court's discretion which is 'especially broad' given the underlying equitable principles involved." *Hopper v. Euclid Manor Nursing Home, Inc.*, 867 F.2d 291, 294 (6th Cir. 1989).

Larson has not demonstrated an "unusual and extreme situation" that would justify vacating the order discharging Gun and Leaf as her attorneys. As noted above, she may make out a case for relief under subparagraph (3), but she has not shown "something more" than that. Larson has spewed forth a bevy of complaints against her former lawyers. But those allegations serve only to confirm the wisdom of separating her from their representation. They do not undermine the rationale for terminating them from this case. Rule 60(b)(6) does not support a request for relief from the discharge order.

## V. Conclusion

The Court's jurisdiction to entertain Karen Larson's global fee disputes with attorneys Gun and Leaf is dubious. Even if there might be supplemental jurisdiction on the fees issue, Larson's grievances against her former attorneys extend well beyond that. And it is prudent to decline supplemental jurisdiction over a claim that might result in piecemeal adjudication of all the complaints Larson has lodged against her former lawyers. *See* 28 U.S.C. § 1367(c)(2). Larson has not established good grounds under Federal Rule of Civil Procedure 60(b) for relief from the order granting Gun's and Leaf's motion to withdraw as her attorneys.

Accordingly, it is **ORDERED** the defendant Karen Larson's motion for relief [dkt. #115] is **DENIED**.

s/David M. Lawson<br>
DAVID M. LAWSON<br>
United States District Judge

Dated: March 28, 2018

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 28, 2018.

                              s/Susan Pinkowski
                              SUSAN PINKOWSKI